## Estate of Albert Kaminsky.

Argued November 12, 1929.

Before Porter, P. J., Trexler, Keller, Linn, Gawthrop, Cunningham and Baldrige, JJ.

*Thomas L. Kane,* for appellants, cited: Oller v. Bonebrake, 65 Pa. 338; Wills v. Hardcastle, 19 Pa. Superior Ct. 525; Hoffman v. Berwind-White C. Min. Co., 265 Pa. 476; Campbell v. Jefferson Ex., 296 Pa. 368; Kaufmann v. Friday, 201 Pa. 178.

*John A. Metz,* and with him *Norman Gluck,* for appellees.—The contract was executed and the consideration paid by both parties: Piper v. Queeney, 282 Pa. 135.

The delivery of the check amounted to an equitable assignment of the fund: Jermyn v. Moffitt, 75 Pa. 399; Nesmith v. Drum, 8 W. & S. 9; Philes Estate, 14 Philadelphia Reports 330.

OPINION BY LINN, J., February 28, 1930:

In No. 129, John W. Kaminsky appeals as administrator of his father, Albert Kaminsky, deceased, and in No. 130, as next of kin. Appellees are John S. Reskovac and wife. At the audit of the administrator's account the Reskovacs claimed the amount of decedent's savings deposit in the Union Trust Company under equitable assignment made in circumstances to be stated. The learned court below held that the deposit belonged to the Reskovacs and not to decedent and awarded it to them. Though appealing in two capacities, appellant states that the questions raised are the same in both appeals. We, of course,

limit our consideration to those specified in the statement of questions involved; there are five: (1) Was the contract in force? (2) Was there an equitable assignment? (3) Was a parol variation of the written contract permitted by the court? (4) "Was there inequality in language, knowledge, and confidential relationship between the parties to the transaction so great as to render it fraudulent?" (5) Was the contract "a wager on human life against public policy and unenforceable?"

It may at once be said that nothing in the record justifies discussion of the last three points as will appear by what shall be said of the first two.

Decedent, who came from Austria Hungary in 1900, was employed as miner and laborer; he became a widower in 1923 and continued for a time to live with two of his children. In 1923 he sold his house. Thereafter he lived with one or other of his children but did not get on amicably with them. Five disinterested witnesses testified that decedent stated to them (in substance) that he couldn't live with his children; in addition, appellant, the member of his family with whom decedent lived last, testified that he quarreled with decedent because "I would not allow him to drink," and that in consequence, decedent went to live elsewhere, and that in the beginning of December, 1927, decedent went to live with the Reskovacs.

On January 3, 1928, the two Reskovacs, the decedent, and one Paul, went to the office of counsel, who prepared and supervised the execution of a written contract whereby the Reskovacs agreed to keep Kaminsky (then aged 58) during his life. The agreement recited that decedent was disabled and would pay to the Reskovacs his $3,000 savings deposit; that they would maintain him in their home, etc., provide "care and medical attendance in case of illness," a suitable funeral and a headstone for his grave. Other provisions need not now be specified. This attorney testi-

fied that he had never before represented either party, though he had seen the Reskovacs while acting for the Union Trust Company in some mortgage matter. On learning the intention and purpose of the parties, he testifies, he asked the Reskovacs to leave the room, and during their absence, discussed with decedent and Paul, the proposed arrangement; decedent insisted that he wished it made. The contract was drawn next day and after more discussion, before execution, it was signed by both parties. Paul the other person present at the interview with counsel, testified that he took the parties to the office of counsel, who, in other transactions had acted for him, and that, both he and the attorney advised decedent that he should not make the arrangement proposed, "that there may be trouble later on;" but that decedent insisted upon doing so, saying that "his children had kicked him out, they were just the words the man used at the time."

When the contract was executed in triplicate the attorney retained one, and gave the other two to Reskovac "with instruction to take the paper to the bank and complete the transaction at the bank and upon completion of it one copy was to be delivered to Mr. Kaminsky and Mr. Reskovac was to retain one." The parties went to the trust company next day and saw the vice-president and treasurer who instructed the assistant treasurer to prepare the necessary check to transfer the savings deposit to the Reskovacs in accordance with the rules of the bank. He prepared such check and saw that it was properly executed by Kaminsky. As appellant's brief indicates some misapprehension of exactly what was done with the check and deposit book, we quote the evidence of the bank officer who supervised the execution of the check.

"Q. What is the last you saw of the [check] yourself?

"A. The last I saw, the last I did with the check was to pass it to the two men [decedent and Reskovac]

outside of the counter, presumably to the man who made the check, because it was still his property, I would suppose.

"Q. You do not remember which one picked it up?

"A. No, I do not."

As the rules of the bank governing the deposit permitted the bank to require notice of withdrawal, the officer who drew the check (it was drawn on and dated January 5, 1928) applied the rules and fixed May 7, 1928, as the date of payment. The rules also required that "in all cases in which the whole amount is drawn, the book must be given up to the corporation."

The evidence is silent as to the exact time when the Reskovacs received the contract, the check and the deposit book. They produced and presented both the check and the book to the bank on May 7, 1928, and demanded payment, but payment was refused by the bank "because maker dead," (so a bank officer noted on the check).

On January 5, Kaminsky became ill and the Reskovacs called in a physician who treated him, making "three or four visits," until January 9 when he died of chronic myocarditis. The Reskovacs paid the physician's bill. They employed an undertaker who took charge of the body and prepared it for interment, but before that could take place, decedent's children took charge of the funeral arrangements. After the interment, the Reskovacs erected a tombstone, as required by their contract and paid for it.

The proof is clear,—indeed there is no contradiction of it—that the Reskovacs discharged their obligation by complete performance. Appellant's point that they have not paid the undertaker's bill has no merit; they incurred liability for it, and, on this record, there appears sufficient justification for their withholding payment until the settlement of this litigation.

It would seem clear that the conduct of the parties to the contract is consistent only with the theory that

from and after January 5 they were both acting in the performance of its terms; the Reskovacs were fur-' nishing a home for Kaminsky and caring for him; Kaminsky had paid the $3,000 by the transfer of the deposit as completely as the transfer could be made consistently with the requirements of the bank; the whole fund was assigned; nothing more remained to be done by the assignor to complete the assignment; his intention was fully executed; nothing was lacking in substance; in such circumstances equity regards the assignment as complete: Bispham's Equity (9th Ed.) Section 167; Oldfield's Estate, 72 Pa. Superior Ct. 340, and cases cited there.

Now as to appellant's questions: not only was the contract in force, but the evidence shows without contradiction that the contract was discharged by performance; there remained only the duty of the bank to pay, with which neither the assignor nor his next of kin had anything more to do. An equitable assignment of the deposit was proved. Instead of standing on their rights against the bank under the assignment, as they might have done, the Reskovacs, after Kaminsky's death, delivered the deposit book to appellant's counsel without prejudice to their rights by the assignment and in circumstances from which an agreement may be inferred to have the ownership of the deposit determined in this proceeding,—the accountant having charged himself with the amount of the deposit. In Gaffney's Estate, 146 Pa. 49, 53, it was said of money credited to a depositor as "trustee for Polly McKim," and paid by the bank to the depositor's executor, and claimed at the audit by Polly McKim: "The money is now in the hands of the executor of Hugh Gaffney; and if it really belongs to the estate of Polly McKim, no good reason is apparent why she should proceed against the bank and compel it to pay the money a second time. An action for money had and received would lie against the Gaffney Estate, and, if such ac-

tion would lie, it may be recovered in this proceeding in the orphans' court.''

As has been said, the last three questions do not merit discussion. When the Reskovacs offered in evidence the agreement to care for Kaminsky, (it recited the present payment of $3,000) counsel who drew the agreement and witnessed its execution, was asked whether the money was paid in cash as recited, and replied that it was not, but was intended to be paid by the check already referred to above; this was objected to as contradicting the contract without proof of fraud, accident or mistake, etc. Such inquiry into the consideration may be made: Piper v. Queeney, 282 Pa. 135, 142.

It is also obvious from what has been said that there was no evidence of confidential relationship between the appellees and decedent (Boyd v. Kilmer, 285 Pa. 533, 537; Leedom v. Palmer, 274 Pa. 22, 25); nor was there ''inequality in language [or] knowledge,'' that would destroy the contract; the court below specifically found otherwise and the finding is supported by evidence. Decedent appears to have been most thoroughly advised about possible adverse contingencies that might result from the arrangement he wished to make, and he made it notwithstanding, and the evidence shows that the Reskovacs complied with their agreement; see Dohan v. Yearicks, 253 Pa. 403; Boyd v. Kilmer, supra.

Appellant complains of several findings of fact made by the learned court below; they are obvious inadvertences which we have here considered as corrected. As to the delivery of the contract and check and bank book to the Rekovacs, the evidence is clear that they had them, and produced them; as their evidence to matters transpiring before Kaminsky's death was objected to and excluded as incompetent under the evidence act, (quite properly) they could of course not say when they received the papers,—but they performed the

contract from January 5 in accordance with its terms. There is no evidence to support appellant's suggestion that they stole the papers because after Kaminsky's death, his trunk and box were found broken open.

The decrees appealed from are affirmed at the costs of appellee.